**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DORTHEE DeJESUS and NESTOR DeJESUS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08cv0043** |
| | ) | |
| **PETE GEREN, ACTING SECRETARY OF** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **THE ARMY OF THE UNITED STATES** | ) | |
| **OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Dorothy DeJesus is a civilian employee of the United States Army at the Blanchfield Hospital at Fort Campbell, in the position of Human Resources Assistant. Nestor DeJesus is her husband. Together they sue Pete Geren in his official capacity as the Secretary of the United States Army (hereafter referenced as "Defendant"). In their Amended Complaint, Ms. DeJesus states claims of racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-301 *et seq.* She also alleges she was improperly denied leave requested under the Family and Medical Leave Act ("FMLA") in September 2007, and that the Defendant's management employees improperly and without permission exposed or disclosed her medical records in a manner inconsistent with the terms and conditions set forth in the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d. Mr. DeJesus seeks damages for loss of consortium.

Presently before the Court is the Defendant's Motion to Dismiss, in Part, and for Summary Judgment (Doc. No. 9). In its motion, Defendant asserts that: (1) to the extent Ms. DeJesus intended to state claims under the FMLA or HIPAA, they must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure; (2) the THRA claim against the Secretary of the Army in his official capacity is actually a claim against the federal government and is barred by the doctrine of sovereign immunity; and (3) Ms. DeJesus's hostile work environment claim and one of her discrimination claims must be dismissed for failure to exhaust administrative remedies.

The Defendant further argues that it is entitled to summary judgment with respect to Ms. DeJesus's Title VII claims because she cannot demonstrate a *prima facie* case of racial discrimination or retaliation, or that the Defendant's proffered legitimate, non-discriminatory reasons for its actions are pretextual. Finally, Defendant argues that even if Ms. DeJesus did exhaust her administrative remedies, she has not asserted a sufficient factual basis to support her hostile work environment or constructive discharge claims. With respect to Nestor DeJesus's claims, the Defendant argues that Title VII does not countenance claims for loss of consortium.

Ms. DeJesus concedes that she has not stated nor did she intend to state a claim under HIPAA, so Defendant's motion with respect to that claim will be granted. The Court agrees that the FMLA and THRA claims must be dismissed for lack of jurisdiction, but will deny the motion to dismiss any of the plaintiff's claims for failure to exhaust administrative remedies. Defendant is entitled, however, to judgment in its favor as to all the plaintiffs' remaining claims, so the motion for summary for summary judgment will be granted in its entirety for the reasons set forth below.

## I.     LEGAL STANDARDS

### A.      Standard Applicable to Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief may be granted." In the recent case of *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955 (2007), the Supreme Court attempted to clarify the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion. The Court expressly disavowed the oft-quoted standard established half a century ago by Justice Black in *Conley v. Gibson*, 355 U.S. 41 (1957), which purported to recognize "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45–46). Characterizing that rule as one "best forgotten as an incomplete, negative gloss on an accepted pleading standard," *Twombly*, 127 S. Ct. at 1969, the Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (citations and quotation marks omitted). Further, the Court emphasized that even though a complaint need not contain detailed factual allegations,

its "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true. . . ." *Id.* at 1965 (internal citations omitted).

The Sixth Circuit has subsequently acknowledged "[s]ignificant uncertainty" as to the intended scope of *Twombly*. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 337 (6th Cir. 2007) ("We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly*, . . . in which the Supreme Court 'retired' the 'no set of facts' formulation of the Rule 12(b)(6) standard . . . ."). In any event, the modified standard embraced by the Sixth Circuit for reviewing 12(b)(6) motions in light of *Twombly* appears to be as follows: On a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1974 (2007)). Thus, although the factual allegations in a complaint need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 127 S. Ct. at 1964–65).

**B.     Standard Applicable to Motion for Summary Judgment**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the nonmoving

party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence will not suffice. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains enough evidence from which a jury could reasonably find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907. If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Liberty Lobby*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.   FACTUAL BACKGROUND

Plaintiff Dorthee DeJesus is an African-American woman. She worked for the federal government, Department of the Army, as a GS-6 Personnel Assistant in the Human Resources Division of the Medical Department Activity Command ("MEDDAC")[1] at Fort Campbell, Kentucky from 2006 until she resigned on February 29, 2008.[2] The Human Resources Division in MEDDAC is split into two sections, a civilian section and a military section. Each has its own tasks, personnel, and supervisors. Ms. DeJesus worked for the civilian personnel section of the Human Resources Division. Her direct supervisor, at all times relevant to this action, was Pamela Elston; Ms. Elston's supervisor was Major Travis Burchett, Chief of Human Resources. In her complaint and amended complaint in this action, as well as in her EEOC filings, Ms. DeJesus identified several events she contends were discriminatory, retaliatory, or both, or contributed to a racially hostile work environment.

### A.   January 4, 2007 "Counseling"

Former United States President Gerald Ford died on December 26, 2006. On December 28, 2006, the current President declared January 2, 2007 a national day of mourning in honor of President Ford. Federal employees were therefore to have that day off. However, because the day of mourning

---

[1] This department is responsible for the personnel at Blanchfield Army Community Hospital.

[2] Ms. DeJesus's assertion that she was constructively discharged is a legal conclusion that will be addressed below.

was announced so close to the January 1 holiday, the hospital commander, Colonel Jerome Penner III, believed that there was not enough time to cancel all the pending appointments already scheduled for January 2 and therefore decided that the hospital should remain open and all hospital employees should report to work on January 2. Employees who were already scheduled for leave would be allowed to remain on leave, and those who had to work would likely be permitted to leave early. Because it was technically a holiday, all employees who came to work would be paid double time, and employees on leave would have their leave time converted to time off for a holiday.

On December 29, 2006, Ms. DeJesus's supervisor, Pamela Elston, informed the employees of the Human Resources Division that, due to the needs of the hospital, they too were to report to work on January 2, 2007 even though it was a holiday. On January 2, despite Ms. Elston's direct order, Ms. DeJesus elected to stay home from work but did not call in sick, request leave, or otherwise inform her chain of command that she was not reporting to work that day. Ms. Elston, noticing her absence, called Ms. DeJesus that morning to ask her why she was not at work. Ms. DeJesus responded that it was a holiday. According to Ms. DeJesus, Ms. Elston responded, "yes, I know it's a holiday, but I gave you specific instruction to report to work today." (Doc. No. 15-1, Hearing Transcript Pt. 1, at 8.) At that point, Ms. DeJesus asked Ms. Elston if she could call her back later, because she had her sister on hold on the phone. After Ms. DeJesus finished speaking with her sister, she did not call Ms. Elston back. Instead, she called Major Burchett. She was upset by the phone call with Ms. Elston—she felt "pressured"—and felt she could speak more calmly with Major Burchett. She used that opportunity to report to him "some of the things that had been going on in [the] office." (Doc. No. 15-1, at 14.) Major Burchett, unlike Ms. Elston, did not instruct Ms. DeJesus to come to work that day. Instead he stated he would set up a meeting with both Ms. Elston and Ms. DeJesus upon her return to work to "fix the situation." (*Id.* at 15.)

During the administrative hearing, Ms. DeJesus acknowledged that Ms. Elston had given her a direct instruction on December 29 to come to work on January 2, but argued that "so much had transpired" after Ms. Elston left work on Friday, December 29 to go to a doctor's appointment, when Ms. DeJesus and her office mates left on Friday, she and her colleagues did not know whether they were supposed to come to work on Tuesday, January 2 or not. (*Id.*) Ms. DeJesus also reported that early the morning of January 2, prior to Ms. Elston's call, Ms. DeJesus spoke with two of her colleagues, Debbie

Davenport and Tami McChesney. Debbie Davenport stated she was not going to work because she had been on leave the prior week and had not received word that she was supposed to report in on January 2 given the holiday. Tami McChesney told Ms. DeJesus she was not going to work that day either.

Ms. DeJesus returned to work on Wednesday January 3, 2007; on January 4, 2007 she had a meeting with Ms. Elston and Major Burchett. At that meeting, Ms. DeJesus was counseled for missing work, ignoring a direct instruction from her supervisor, and failing to employ correct procedure for requesting leave. A counseling memo was prepared but it was not placed in Ms. DeJesus's official file; instead, it was placed in a supervisory file in Ms. Elston's desk drawer.

Ms. DeJesus asserts that neither Ms. Davenport nor Ms. McChesney was counseled for not reporting to work on January 2, 2007. Because Ms. Davenport and Ms. McChesney are both white, Ms. DeJesus believes the counseling she received was discriminatory based on her race. (Doc. No. 15-1, at 21.). According to Ms. Elston, however, Ms. Davenport was on leave when the holiday was announced, and Ms. Elston was never able to get in touch with her directly to instruct her to report to work on January 2. Accordingly, Ms. Davenport never received a direct instruction that she should report to work that day, despite its being a holiday. Ms. McChesney, unlike Ms. DeJesus, actually spoke with Ms. Elston on December 29 and properly submitted a request to take a leave day on January 2.

In any event, Ms. DeJesus first made contact with an EEOC counselor on January 9, 2007, and filed her first formal EEOC complaint on April 25, 2007.

### B.     Plaintiff's May 16, 2007 Evaluation

Ms. Elston was responsible for conducting formal evaluations of Ms. DeJesus's work performance. Major Burchett reviewed and approved the evaluations. On May 16, 2007, Ms. DeJesus received a performance evaluation for that year. (Doc. No. 15-4.) She was rated in four areas, including "Technical Competence," "Adaptability and Initiative," "Working Relationships & Communications," and "Responsibility and Dependability." Four rankings were possible in each area: "Excellence (Exceeds std)," "Success (Meets std)," "Needs Improvement," and "Fails." Ms. DeJesus received "Success" ratings in two areas, "Technical Competence" and "Responsibility and Dependability." She received "Excellence" ratings in the other two areas. Her overall rating, on a scale of 1 to 5 with 1 being the highest, was a 2, for Successful. (Scores of 1 and 3 also were considered to reflect success; 4 was "Fair," and 5 was

"Unsuccessful." The commentary accompanying the evaluation was generally very positive, including such statements as "Consider for positions of increasing scope and greater responsibility," and "Embodies the Army values of LDRSHIP (Loyalty, Duty, Respect, Selfless Service, Honor, Integrity, and Personal Courage." (*Id.*)

Notwithstanding, Ms. DeJesus disagreed with the evaluation and felt she should have received "Excellence" ratings in every category and an overall rating of 1 out of 5, as she had in her previous (and only) evaluation by Ms. Elston in May 2006. According to Ms. Elston, she rated Ms. DeJesus as "successful" rather than "excellent" in the referenced areas because she had noticed recurrent misspellings and other errors in Ms. DeJesus's work. According to Ms. Elston, "successful" meant that Ms. DeJesus was doing what was asked of her in her job description, but was not exceeding expectations. Ms. DeJesus was not deprived of pay, demoted or otherwise subject to any action that affected her job status or responsibilities as a result of the "successful" ratings in her May 2007 evaluation.

However, Ms. DeJesus asserts that the other two employees evaluated by Ms. Elston, including Debbie Davenport and Tami McChesney, received "excellent" ratings overall.[3] Because the other two employees evaluated by Ms. Elston are both white and received slightly higher ratings, Ms. DeJesus believes that the downgrade in her performance evaluation over the prior year was discriminatory based on her race[4] and was retaliatory based on her having made a prior EEOC complaint.

**C.    Promotions of Ms. Cox and Ms. McChesney**

On October 20, 2006, one of Ms. DeJesus's colleagues, Michelle Phillips, passed away. Before her death, Ms. Phillips was a Human Resources Specialist focusing on employee benefits. She was responsible for handling all benefits such as retirement, Thrift Savings Plans, and requests for personnel

---

[3] They each received three "success" ratings and one "excellence" rating, resulting in an overall rating of 1 rather than the 2 Ms. DeJesus had received for two "success" and two "excellence" ratings.

[4] When asked during the hearing why she believed any particular action was discriminatory based on her race, Ms. DeJesus invariably responded "because I'm black" without offering any other substantive basis for her belief that the action in question was racially discriminatory. (Doc. No. 15-3 at 127; *see also* Doc. No. 15-1, at 21 ("The Investigator: Why do you believe the letter of counseling you were issued [on January 4, 2007] was discriminatory because of your race? The Witness: Because I'm black and those are two white females.").)

actions. She was at the GS-9 pay level in the Human Resources Division of MEDDAC.

After Ms. Phillips died, her work was temporarily redistributed. At the same time, there was an ongoing effort to restructure the civilian personnel advisory center ("CPAC") at Fort Campbell. CPAC, as part of its restructuring, took back the duties relating to employee benefits and retirement that Ms. Phillips had once performed. Ms. Elston absorbed the remainder of Ms. Phillips' work, and redistributed much of it to others in the office, including Ms. DeJesus, on a temporary basis. Ultimately, she permanently reassigned some of the work to Tami McChesney, a civilian employee at the GS-5 pay level. The work assigned to Ms. McChesney included responding to requests for personnel action and for leave without pay, and dealing with resignations, separations, name changes and reassignments. This work was classified as being at the GS-6 level and was therefore "grade impacting" for Ms. McChesney. Accordingly, Ms. McChesney's position was upgraded to the GS-6 pay grade in May 2007. Ms. DeJesus's position was already at the GS-6 level, so the work, even if it had been reassigned to Ms. DeJesus, would not have affected her grade level.

At the administrative hearing, Ms. DeJesus asserted that after she first contacted the EEOC in January 2007, she noticed that Ms. Elston started assigning work to Ms. McChesney that Ms. DeJesus had previously performed. Ms. DeJesus also acknowledged, however, that the shift in job duties did not affect her pay grade, and the changes resulted from the death of Michelle Phillips. (*See* Agency Hearing Transcript, Part II, Doc. No. 15-3, at 19.) She simply contends that she should have been assigned grade-impacting duties as well.

In July 2007, another employee's position in the Human Resources Division at MEDDAC was upgraded from a GS-5 to a GS-7, or one grade above Ms. DeJesus's position. However, that employee (Sherry Singleton Cox) had a different supervisor than Ms. DeJesus. Ms. Cox's supervisor was Brenda Terry. According to Ms. Terry, prior to July 2007, she had been performing many of the duties that should have been performed by the person in Ms. Cox's position. Ms. Terry therefore decided to delegate some of those duties to Ms. Cox. The duties that were reassigned were "grade-impacting" and resulted in Ms. Cox's position being upgraded from GS-5 to GS-7. Ms. Terry, again, was not Ms. DeJesus's supervisor and had no authority to delegate work to her or to promote her.

On July 13, 2007, shortly after Ms. Cox was promoted, Ms. DeJesus filed a second EEOC

complaint, this time alleging retaliation.

### D.     August 6, 2007 "AWOL" Designation

On or around Friday, August 3, 2007, Ms. DeJesus was forty-five minutes late for work.  Although she had been instructed on numerous occasions on the procedure to follow for calling in sick or reporting late, Ms. DeJesus did not follow that procedure.  Instead, according to Ms. DeJesus, she called the office at around 6:45 that morning.  Ms. Elston was out that week and the only person in the office that early was another employee, Kenneth Hammond.  Ms. DeJesus told Mr. Hammond that she was running a little late and for him to please tell the acting supervisor, Judy Thomason, that she would be late.   Ms. Thomason did not usually arrive until 7:30 a.m., however, so Ms. DeJesus also told Mr. Hammond she thought she would actually be at work before Ms. Thomason arrived.

Unbeknownst to Ms. DeJesus at that time, Ms. DeJesus was actually ill.  She pulled over at a rest stop on the interstate to rest and fell asleep.  She ended up being approximately 45 minutes late.  When she got to work, she e-mailed Ms. Thomason to let her know she was late and submitted a retroactive request for 45 minutes of leave time.  Again, Ms. DeJesus did not realize she had some sort of illness at that point.  Ms. Thomason did not act on the leave request; she gave it to Ms. Elston on her return.

Ms. Elston returned to the office on Monday, August 6, 2007 and, toward the end of the day, asked Ms. DeJesus to come speak with her.  She told Ms. DeJesus that, because she had disobeyed a direct order again and had not followed proper procedures for requesting leave time, Ms. Elson would not approve the leave request.  Instead, the 45 minutes Ms. DeJesus had missed Friday morning would be considered absence without leave ("AWOL"). In addition to charging Ms. DeJesus with being AWOL, Ms. Elston also gave Ms DeJesus another written memorandum of counseling.  Ms. DeJesus asserts that Ms. Elston did not give her the chance to explain what had happened Friday morning and instead kept repeating that she had failed to follow the appropriate procedure.   Ms DeJesus maintains that Ms. Elston's decision to give her a counseling memorandum and to charge her as AWOL for being 45 minutes late was discriminatory based on her race and was in retaliation for Ms. DeJesus's having filed an EEOC complaint.

Being charged with 45 minutes of AWOL resulted in a loss of $19.01 in pay.  When Ms. DeJesus presented documentation to Colonel Heimall that she had a medical condition, the decision to charge 45

minutes of AWOL was reversed by the very next pay period. The 45 minute absence was converted to sick leave and the $19.01 that had initially been docked was reimbursed.[5]

### E. Procedural History

As previously mentioned, Ms. DeJesus filed EEOC charges in April and July 2007 alleging discrimination and retaliation. An agency fact-finding hearing was conducted on January 30 and 31, 2008 to investigate her claims. Ms. DeJesus's initial complaint in this Court was actually filed on January 16, 2008, prior to the agency hearing. She amended her complaint in March 2008 to include allegations of constructive discharge as well as violations of the FMLA and HIPAA. The Defendant has now filed its motion to dismiss and for summary judgment.

## III. THE MOTION TO DISMISS DORTHEE DeJESUS'S CLAIMS

### A. Ms. DeJesus's THRA Claim Is Barred by the Doctrine of Sovereign Immunity

Because the plaintiffs' claims against Secretary Geren are brought against him in his official capacity, the claims are the same as claims against the Army or the United States itself. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as

---

[5] Ms. DeJesus referenced a number of other perceived discriminatory or harassing events which were investigated during the January 2008 administrative hearing but are not identified by the Defendant in its motion nor referenced in the plaintiffs' response in opposition thereto. These include an allegation that in March or April 2006, when a white employee complained about an Hispanic employee's music being too loud, the Hispanic employee was immediately required to turn the music off. When Ms. DeJesus complained about a white employee's country music being too loud, however, her supervisor did not take reasonable action to correct the situation or to ensure that the problem did not recur. The investigator pointed out that Ms. DeJesus had a timeliness problem with respect to any claim related to the music issue. (Doc. No. 15-1, at 76–77.)

Ms. DeJesus also complained about several incidents involving Major Burchett that made her uncomfortable and which she characterized as sexual harassment. Specifically, she alleged that he used inappropriate language (but not racially charged language), made a comment about only hiring attractive women, picked up Tami McChesney and threw her over his shoulder on one occasion, and acquiesced to two other female employees' requests that he pick them up to "pop" their backs. Ms. DeJesus found these incidents to be offensive and shocking, and to create a hostile work environment. It is not clear when any of these events occurred. The parties do not mention them in their filings and the Court presumes that Ms. DeJesus has abandoned any claim based on these actions.

a suit against the entity." *Id.* at 166. (*See also* Doc. No. 8, Am. Compl., at ¶ 2 ("The Defendant is a sovereign political entity.").)

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). Waiver of immunity may not be implied; rather, it must be "unequivocally expressed in the statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Mitchell*, 445 U.S. at 538.

When jurisdictional facts are challenged, the party claiming jurisdiction bears the burden of demonstrating that the court has jurisdiction over the subject matter. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 324 (6th Cir. 1990). Sovereign immunity is a jurisdictional bar; accordingly, in order to proceed against the United States or one of its agents in his official capacity, plaintiffs have the burden of identifying a waiver of sovereign immunity in their complaint in order to avoid dismissal for lack of subject matter jurisdiction. *Reetz v. United States*, 224 F.3d 794, 795 (6th Cir. 2000). Defendant in this case argues that plaintiffs have not shown that the United States or its agents or agencies have waived sovereign immunity or consented to be sued for violations of the Tennessee Human Rights Act. A cursory examination of the complaint reveals that Ms. DeJesus has not alleged any waiver of immunity that would allow suit against the Secretary of the Army under a state civil rights statute. Moreover, the Supreme Court has held that Title VII is the preemptive and exclusive remedy for federal employment discrimination falling under Title VII. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976). *See also Steiner v. Henderson*, 354 F.3d 432, 434–35 (6th Cir. 2003) (noting that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment" (citing *Brown*, 425 U.S. at 835)).

In their brief, plaintiffs "take no position on this aspect of the defendant's motion." (Doc. No. 18, at 7.) Because plaintiffs have failed to demonstrate that the federal government has consented to be sued thereunder, Ms. DeJesus's THRA claim must be dismissed for lack of jurisdiction.

### B. Ms. DeJesus Cannot Bring an FMLA Claim

The only factual allegation in the Amended Complaint that remotely supports a claim under the FMLA is the statement that "on or about September 2007 [Ms. DeJesus] requested and was denied leave under the Family and Medical Leave Act." (Doc. No. 8 (Am. Compl.) at ¶ 10.) Although this lone allegation does not actually make it clear whether Ms. DeJesus intended to state a claim under the FMLA

or whether she is simply asserting that denial of a leave requested under the FMLA was part of the discrimination and retaliation she allegedly suffered at the hands of her employer, Ms. DeJesus contests the Defendant's suggestion that this claim should be dismissed.

She does not, however, present any valid arguments for opposing the Defendant's motion to dismiss this claim. First, Ms. DeJesus has not satisfied the standard established by the Supreme Court in *Twombly* for pleading a plausible claim for relief. *See Bledsoe*, 501 F.3d at 502 (holding that in reviewing a motion to dismiss, courts must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face"). Here, the only facts alleged in support of the FMLA claim are that Ms. DeJesus sought and was denied FMLA leave. She does not indicate why she sought leave or that denial of her request was in any way wrongful. Consequently, these allegations do not come close to stating a "legally cognizable cause of action," much less "show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527. The amended complaint does not even contain "a formulaic recitation" of the elements of an FMLA cause of action which the Supreme Court in *Twombly* Court stated would be *insufficient* to state a claim. See 127 S. Ct. at 1964–65 ("[A] formulaic recitation of the elements of a cause of action will not do"). On that basis alone, Ms. DeJesus's putative FMLA claim is subject to dismissal.

Moreover, while Ms. DeJesus purports to bring her action under what is commonly referenced as "Title I" of the FMLA, 29 U.S.C. §§ 2601 *et seq.*, the enforcement remedies in Title I apply only to "eligible employees." 29 U.S.C. § 2617. The term "eligible employees" is defined in Title I expressly to exclude "any Federal officer or employee covered under [Title II of the FMLA, codified at] subchapter V of Chapter 63 of Title 5," 29 U.S.C. § 2611(2)(B)(i). Ms. DeJesus is instead covered by Title II of the FMLA, 5 U.S.C. §§ 6381 *et seq.*, which guarantees the same substantive rights to federal employees but does not authorize bringing a claim to vindicate those rights against the federal government.

Title I and Title II are, in fact, basically identical in terms of the *substantive* rights provided for employees. For example, both provide twelve weeks unpaid leave for the birth or adoption of a child, in order to care for a family member, or because of a serious health condition that makes the employee unable to perform the functions of his or her position. *Compare* 5 U.S.C. § 6382(a)(1) (Title II) *with* 29

U.S.C. § 2612 (Title I). However, as the Defendant points out, the two provisions differ markedly in one critical respect: Title I explicitly provides a private right of action for employees who suffer violations under the Act, but Title II does not. *Compare* 29 U.S.C. § 2617 ("Enforcement") (Title I) *with* 5 U.S.C. §§ 6381 through 6387 (Title II). Instead of a section titled "Enforcement," Title II contains a section titled "Regulations," which states:

> The Office of Personnel Management shall prescribe regulations necessary for the administration of this subchapter. The regulations prescribed under this subchapter shall, to the extent appropriate, be consistent with the regulations prescribed by the Secretary of Labor to carry out title I of the Family and Medical Leave Act of 1993.

5 U.S.C. § 6387. The regulations promulgated by the Office of Personnel Management pursuant to that authority do not reference any means of enforcement, *see* 5 C.F.R. Ch. I, Subch. B, Pt. 630, Subpt. L, while the regulations promulgated by the Department of Labor implementing Title I include a subpart entitled "What Enforcement Mechanisms Does FMLA Provide?" *See* 29 CFR § 825.400. This provision outlines the options for private-sector employees who believe their rights have been violated, which include "(1) [f]iling, or having another person file on his or her behalf, a complaint with the Secretary of Labor, or (2) [f]iling a private lawsuit pursuant to section 107 of FMLA." *Id.* Finally, the interim regulations issued by the Office of Personnel Management (OPM) further support the conclusion that the statute does not provide a private right of action for federal employees, as they state: "If an employee believes an agency has not fully complied with the rights and requirements provided under [5 U.S.C. §§ 6381 through 6387] and the regulations set forth below, the employee may file a grievance under an agency's administrative grievance procedures or negotiated grievance procedures." 581 Fed. Reg. 39,602.

As previously indicated, "suits against the federal government are barred by sovereign immunity absent an unequivocally expressed waiver." *Russell v. United States Dep't of the Army*, 191 F.3d 1016, 1018–19 (9th Cir. 1999) (citing *Lehman v. Nakshian*, 453 U.S. 156, 160–61 (1981); *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 734 (1982) (suits against the government may proceed "only if Congress has consented to suit; a waiver of the traditional sovereign immunity cannot be implied but must be unequivocally expressed" (internal quotation marks and citations omitted)). Title II of the FMLA does not contain any such waiver that would permit suits against the federal government for violation of its provisions. Simply put, the FMLA does not provide a private right of action to Title II employees.

Ms. DeJesus's putative cause of action for a violation of the FMLA must therefore be dismissed

for lack of jurisdiction. *Cf. Giesken v. Dep't of Veterans Affairs*, No. 06-14901-BC, 2007 WL 1287958, *1 (E.D. Mich. May 2, 2007) (holding that because the plaintiff was covered by Title II of the FMLA and Title II does not create a private right of action or waive federal governmental immunity, the plaintiff's suit for violations of the FMLA had to be dismissed); *Sutherland v. Bowles*, No. 94-71570, 1995 WL 367937, 1 (E.D. Mich. Jan. 17, 1995) (same); *cf. Mitchell v. Chapman*, 343 F.3d 811, 826 (6th Cir. 2003) (recognizing that the FMLA limits a private right of action to "eligible employees").

### 3.      Whether Plaintiff Failed to Exhaust Administrative Remedies

Defendant alleges that Ms. DeJesus raises two new factual allegations in her complaint that were not included in her two EEOC complaints nor investigated at the administrative level, including (1) that on August 6, 2007 she was falsely accused of failing to obey a direct order and treated disrespectfully without cause (Am. Compl. ¶ 8); and (2) that she was subjected to a hostile work environment (Am. Compl. ¶ 12).

In the Sixth Circuit as elsewhere, federal employees who allege that they have been victims of discrimination must exhaust their administrative remedies. *See Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991) ("The right to bring an action under Title VII regarding equal employment in the federal government is predicated upon the timely exhaustion of administrative remedies. . . ."); *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078 n.4 (6th Cir. 1988) (noting the exhaustion requirement applied in the context of a federal employee's handicap-discrimination claim brought under the Rehabilitation Act). The purpose of the requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation. *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (citing *EEOC v. Bailey*, 563 F.2d 439, 447 (6th Cir. 1977)).

In *Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367 (6th Cir. 2002), the Sixth Circuit reiterated "the general rule in this circuit . . . that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id.* at 380 (internal citation omitted); *see also Bray v. Palm Beach Co.*, 907 F.2d 150, 1990 WL 92672, at *2 (6th Cir. June 29, 1990) (finding "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge"). As explained in

*Weigel*, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." 302 F.3d at 380 (quoting *Davis*, 157 F.3d at 463). This principle has become known as the "expected scope of investigation" test. *Weigel*, 302 F.3d at 380. *Cf. Dixon v. Ashcroft*, 392 F.3d 212 (6th Cir. 2004) (noting that the failure to check the "Reprisal" box on the Complaint of Discrimination to indicate a retaliation claim is not dispositive of whether a plaintiff exhausted his administrative remedies with regard to that claim). Accordingly, the determinative inquiry in this case is whether Ms. DeJesus alleged sufficient facts in her EEOC complaints to put the agency on notice of her "hostile work environment" claim or a claim that on August 6, 2007 she was wrongfully accused of failing to obey a direct order and treated disrespectfully without cause.

With respect to the August 6, 2007 incident, there is no dispute that it was not raised as a specific problem in either of Ms. DeJesus's formal EEOC complaints, both of which were filed prior to August 6, 2007. (*See* Doc. No. 15-6 (4/25/2007 Formal Complaint of Discrimination); Doc. No. 15-7 (7/13/2007 Formal Complaint of Discrimination).) However, at the Hearing held at Ft. Campbell, Kentucky on January 30 and 31, 2008 before an Investigator with the U.S. Department of Defense Investigation and Resolutions Division, the Investigator, Carol Scott, expressly referenced the August 6, 2007 incident as one of six claims accepted for investigation. (*See* Doc. No. 15-8, at 2–3.) The incident was specifically, and exhaustively, investigated during the Hearing. (*See* Doc. No. 15-3, at 83–121 (Hearing transcript at 183–221).) More importantly, the Defendant was clearly on notice that Ms. DeJesus was bringing claims of racial discrimination and retaliation, and the purpose of such notice was served, insofar as an investigation was actually triggered and this allegation considered at length. The motion to dismiss this allegation for failure to exhaust administrative remedies will therefore be denied.

Likewise, although Ms. DeJesus did not use the words "hostile work environment" in either of her formal EEOC complaints, the Defendant was apparently on notice that Ms. DeJesus intended to assert a hostile work environment claim, as is evidenced by the questions posed to her during the agency investigatory hearing. Specifically, in the context of a discussion about allegedly offensive incidents involving Major Burchett, Ms. DeJesus (the "Witness") testified as follows:

> THE INVESTIGATOR: Do you believe that these incidents created a hostile work environment?

THE WITNESS:  The one where he put her across his shoulder, I believe that it was.

(Doc. No. 15-3, at 64.)

THE INVESTIGATOR:  Did you believe that Major Burchett's language and his comment about hiring only women created a hostile work environment?

THE WITNESS:  What do you mean by a hostile – you know, like making it –

THE INVESTIGATOR:  Uncomfortable, subjecting you to things that are inappropriate or offensive.

THE WITNESS:  Yes.

(Doc. No. 15-3, at 71.)

THE INVESTIGATOR:  And why do you believe Ms. Elston's actions were discriminatory because of your EEO activity?

THE WITNESS:  Because it was creating a hostile work environment.

(Doc. No. 15-3, at 97.) [6]

The Court finds that Defendant had adequate notice of the hostile work environment claim such that dismissal for failure to exhaust administrative remedies is not appropriate, even though summary judgment on the undisputed facts is warranted, as addressed below.

## IV.    THE MOTION FOR SUMMARY JUDGMENT AS TO MS. DeJESUS'S REMAINING CLAIMS

### A.    The Title VII Discrimination Claim

The plaintiff here does not assert that she has direct evidence of racial discrimination; instead, she apparently seeks to prove discrimination with indirect evidence.  When a plaintiff presents only indirect evidence of disparate treatment based on race, a Title VII claim is analyzed under the familiar *McDonnell Douglas* burden-shifting approach.  *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 703 (6th Cir. 2007).  " 'On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.' "  *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

---

[6]  This latter line of questioning suggests that Ms. DeJesus considered her "hostile work environment" and retaliation claims to be basically co-extensive.

The plaintiff's first step under Title VII is to establish a *prima facie* case of racial discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). There are many "context-dependent ways by which plaintiffs may establish a *prima facie* case." *Macy*, 484 F.3d at 365 (emphasis removed). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* In the case at bar, both parties assume that the applicable elements of Ms. DeJesus's *prima facie* case of discrimination include proof that (1) plaintiff is a member of a protected class; (2) she was qualified for her job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was replaced by or treated less favorably than a similarly situated individual outside her protected class. *Cf. Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

If the plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the challenged employment decisions. *Braithwaite*, 258 F.3d at 493 (internal quotation marks omitted). If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual, which can be done " 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.' " *Johnson*, 319 F.3d at 866 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Because Ms. DeJesus has not established a *prima facie* case of discrimination, the Court need not consider whether the defendant has offered legitimate, non-discriminatory reasons for its actions, or whether Ms. DeJesus has proffered evidence sufficient to rebut those reasons.

### (1)     *Ms. DeJesus's* Prima Facie *Case of Discrimination*

There is no dispute that Ms. DeJesus is an African-American woman and as such a member of a protected class by virtue of both her race and her gender. Defendant likewise does not contest the fact that Ms. DeJesus was qualified for her job and performed it satisfactorily. With respect to the third element of her claim, Ms. DeJesus points to a number of incidents she claims constitute adverse employment actions, including (a) the January 4, 2007 counseling; (b) the May 16, 2007 performance evaluation; (c) Ms. McChesney's and Ms. Cox's position upgrades in May and July 2007; and (d) the

August 6, 2007 counseling and AWOL designation.[7]   In addition, Ms. DeJesus alleges that she was constructively discharged.  Defendant contends, in response, that none of the referenced actions qualifies as an "adverse employment action" as that term has been defined in the context of Title VII claims. Defendant also asserts that Ms DeJesus cannot show she was treated less favorably than similarly situated non-protected employees.  Each action regarding which Ms. DeJesus complains in conjunction with her discrimination claim is addressed below.

(a)  The January 4, 2007 Counseling

It is clear under Sixth Circuit law that the January 4, 2007 counseling, standing alone, does not constitute an adverse employment action sufficient to give rise to a discrimination claim, particularly given that the "counseling memorandum" in this instance was not even placed in the plaintiff's official personnel file and did it result in time off, suspension, loss of pay or benefits, or a change in duties.  *See Handshoe v. Mercy Med. Ctr.*, 34 Fed. Appx. 441, 447 (6th Cir. 2002) (in the context of a disability discrimination claim, holding that disciplinary "write-up" placed in plaintiff's file was not an adverse employment action); *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 409–10 (6th Cir. 1999) (holding that an employee's receipt of several "counseling memoranda" disciplining him for specific rules infractions but that did not have any substantive effect on his job benefits or duties did not amount to materially adverse actions for purposes of his Title VII race discrimination claim); *McMillian v. Potter*, 130 Fed. Appx. 793, 796 (6th Cir. 2005) (affirming summary judgment on the grounds that a proposed letter of warning in lieu of suspension was not an adverse employment action, because the letter was a mere proposed action, no further disciplinary action was ever instituted against the employee, and the proposed letter was ultimately removed from the plaintiff's personnel file; the proposed letter did not involve salary or work hour changes nor was it tantamount to a demotion).

Moreover, Ms. DeJesus has not shown she was treated less favorably than similarly situated employees with regard to this instance.  Although it was established that both Debbie Davenport and Tami McChesney, like Ms. DeJesus, did not report to work on January 2, 2007 but, unlike Ms. DeJesus, were not subject to any form of discipline, Ms. DeJesus has not shown that these employees were

---

[7]  Ms. DeJesus also alleges that most of these actions were retaliatory as well.  Her retaliation claim is addressed below.

similarly situated. Ms. Davenport was on leave during the week prior to the January 2 holiday, and Ms. Elston was never able to get in touch with her to give her a direct instruction to report to work on January 2. Ms. McChesney was at work when the order was given, but she specifically asked Ms. Elston if she could take a leave day on January 2, before Ms. Elston left work for her doctor's appointment on December 29, 2006. Ms. DeJesus, unlike Ms. Davenport, was at work on December 29 and was given a direct instruction to report to work on January 2, 2007. Unlike Ms. McChesney, Ms. DeJesus had not followed the proper procedures for taking a leave day on January 2. Consequently, Ms. DeJesus cannot show she was similarly situated to the other two employees. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) ("[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

Ms. DeJesus has not stated a *prima facie* case related to this incident because she has not demonstrated that she was subject to an adverse employment action nor that she was treated differently than similarly situated white employees.

### (b) The May 16, 2007 Performance Evaluation

Likewise, the allegedly inaccurate work performance evaluation dated May 16, 2007 was not an adverse employment action. Ms. DeJesus received an overall assessment of "2" rather than the highest possible assessment of "1" out of five. The "2" rating indicated she was "successful" in her job and met or exceeded expectations. It was not an unfavorable or adverse rating, even though it was not as high as she expected and believed she deserved. The assessment did not result in less pay nor have any tangible, objective adverse repercussions. Under these circumstances, Ms. DeJesus's receipt of a performance evaluation that was slightly lower than she felt was warranted did not constitute an adverse employment action sufficient to state a claim of discrimination. *Cf. Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) (holding that an employee's mid-range performance evaluation of "fully successful" was not the type of adverse employment action contemplated by Title VII). *See also McMillian*, 130 Fed. Appx. at 796 ("[S]imply because an employee is made unhappy by an action does not mean that he has identified an adverse employment action."); *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (a "bruised ego" is insufficient to constitute an adverse employment action); *Hollins v. Atl. Co.*, 188

F.3d 652, 662 (6th Cir. 1999) (an adverse employment action must work a "materially adverse change in the terms and conditions of [plaintiff's] employment").  Ms. DeJesus therefore has not established a *prima facie* claim of discrimination based on the May 16, 2007 evaluation.

        *(c)*        *Ms. McChesney's and Ms. Cox's Position Upgrades*

Ms. DeJesus also alleges that she was the victim of discrimination when two other similarly situated employees had their positions upgraded but she did not.  One of those employees, Sherry Singleton Cox, was upgraded from a GS-5 to a GS-7 in July 2007.  Ms. DeJesus was a GS-6.  However, Ms. Cox works in the military personnel section while Ms. DeJesus worked in the civilian section, and they had different supervisors.  Thus, with respect to Ms. Cox, regardless of whether Ms. DeJesus can prove an adverse employment action as a result of Ms. Cox's promotion, Ms. DeJesus cannot show that she and Ms. Cox were "similarly situated" as required for a *prima facie* case.  *See Mitchell v. Toledo Hosp.*, 964 F.2d at 583 ("[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment *must have dealt with the same supervisor. . . .*").

The other employee, Ms. McChesney, was upgraded from a GS-5 to a GS-6—the same level as Ms. DeJesus—as a result of a reassignment of some duties within the personnel department after the death of one of the plaintiff's colleagues within the department.  Because Ms. DeJesus was already a GS-6, the new job duties assigned to Ms. McChesney, if they had been assigned to Ms. DeJesus instead, would not have been "grade impacting" for her.  Rather, they simply would have caused her to have more work.  Regardless, the fact that another employee was upgraded to Ms. DeJesus's same level, without impacting Ms. DeJesus's stature or job responsibilities in any way, did not result in a "materially adverse change in the terms and conditions of [Ms. DeJesus's] employment" and therefore did not constitute an adverse employment action.  *Hollins*, 188 F.3d at 662.  Moreover, Ms. McChesney was not similarly situated to Ms. DeJesus in that she was a full grade lower than Ms. DeJesus initially, and then promoted to Ms. DeJesus's level as a result of reassignment of some of the duties within the office.  Ms. DeJesus has not demonstrated a *prima facie* case of discrimination in relation to this action either.

        *(d)*        *The August 2007 Counseling and AWOL Designation*

Ms. DeJesus alleges that she was the victim of discrimination when she was charged with being AWOL after reporting to work forty-five minutes late on or about August 3, 2007.  After it was discovered

she had a medical problem, however, the AWOL was reversed, and the approximately $19.00 that had been docked from her pay was reinstated on her next paycheck. The Court finds that this disciplinary action, which was promptly reversed, is the type of *de minimis* employment action the Sixth Circuit has found not to be actionable. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc), *aff'd Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). *See also Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545–46 (6th Cir. 1999) (holding that a professor failed to establish she had suffered an adverse employment action based on the dean's refusal to recommend her for tenure when she successfully protested the action, eventually received tenure, and therefore suffered no "final or lasting harm"). Ms. DeJesus therefore cannot establish a *prima facie* case with respect to this action either.

    *(e)*  *Constructive Discharge.*

   Finally, Ms. DeJesus asserts that she suffered an adverse employment action when she was constructively discharged. As the Supreme Court has noted in the context of a sexual harassment/hostile work environment lawsuit, the standard for proving constructive discharge is quite high, and considerably more stringent than the standard for proving discrimination or hostile work environment:

> For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, . . . the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor [Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)] (internal quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g.*, *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir.1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

*Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). As the Sixth Circuit has stated, "workplace harassment that is severe and pervasive enough to create a hostile work environment may in some circumstances constructively discharge the employee." *Plautz v. Potter,* 156 Fed. Appx. 812, 819 (6th Cir. 2005). Thus, where the actions alleged are not sufficient to state a claim for hostile work environment, "they necessarily do not rise to the level of compelling a reasonable person to resign." *Id.*

In this case, Ms. DeJesus requested and was permitted to take early retirement in February 2008 under the Voluntary Early Retirement Authority, *see* 5 U.S.C. §§ 8336(d)(2) and 8414(b)(1)(B). As indicated above, the "harassing" and discriminatory events to which Ms. DeJesus was allegedly subjected, even considered all together, are not sufficiently egregious to warrant a finding of discrimination; they certainly are not sufficient to compel a reasonable employee to quit. Ms. DeJesus's resignation was not a constructive discharge and cannot be considered an adverse employment action that would satisfy that element of her *prima facie* case of discrimination.

    *(f)    The Defendant Is Entitled to Summary Judgment on the Discrimination Claim*

In sum, Ms. DeJesus has not demonstrated that she was subjected to any adverse employment action nor, generally speaking, that was treated disparately from similarly situated colleagues. Because Ms. DeJesus has not established the requisite elements of a *prima facie* case of discrimination, the Defendant is entitled to summary judgment in its favor as to that claim.

    **B.    The Title VII Retaliation Claim**

To establish a *prima facie* case of Title VII retaliation, a plaintiff must show that "(1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006) (citing, among others, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

With respect to the third element, demonstrating an adverse action, the Supreme Court made clear in *White* that the scope of Title VII's retaliation provision is broader than Title VII's discrimination provision. Specifically, in contrast to Title VII's discrimination provision, the "adverse action" requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions or status of employment, or to those acts that occur at the workplace. *White*, 548 U.S. at 61–64. The retaliation provision instead protects employees from conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citations omitted). The Court emphasized, however, that the adversity at issue had to be "material," stating: "We believe it is important to separate significant from trivial harms." *Id.* at 68. The Court also adopted an

objective rather than a subjective standard for judging whether the retaliatory action is sufficiently material:

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

Id. at 68–69 (citations omitted).

Here, as with Ms. DeJesus's discrimination claim, there is no dispute as to whether the first two elements of the *prima facie* claim are met: Ms. DeJesus filed her first formal complaint of discrimination with the EEOC in April 2007, thereby engaging in protected activity, and there is at least a question of fact as to whether the Defendant knew she had done so. At issue is whether Ms. DeJesus subsequently experienced any adverse action that was causally related to her having made an EEOC charge. Ms. DeJesus asserts that after she filed an EEOC complaint related to the January 4 counseling, she experienced retaliation in the form of essentially the same events she claims constitute adverse employment actions for purposes of her discrimination claim: (1) the "successful" rather than "excellent" ratings on her May 16, 2007 performance evaluation; (2) Ms. McChesney's and Ms. Cox's position upgrades in May and July 2007; and (3) the August 2007 counseling and AWOL designation.[8] She also asserts, again, that the retaliatory harassment was so pervasive that it resulted in her constructive discharge.

Of these events, as previously indicated, the May 16 performance evaluation was not a negative evaluation. No reasonable jury could find that a "successful" evaluation is the type of adverse action that would persuade a reasonable worker from making or supporting a charge of discrimination. Likewise, the position upgrades that affected other employees but did not adversely affect Ms. DeJesus could not be adverse actions sufficient to support a retaliation claim for the same reasons discussed above: Ms. Cox

---

[8] In her Amended Complaint, Ms. DeJesus also asserts that her medical records "were distributed in a fashion prohibited by [HIPAA]" at some point in September 2007 (Am. Compl. ¶¶ 7, 10.) However, the parties have not pointed to any evidence in the record regarding this event. It apparently took place after the filing of Ms. DeJesus's second EEOC complaint in July 2007. It was not mentioned in any EEOC complaint or amendment thereto and does not appear to have been investigated at the hearing that took place in January 2008. The Court therefore will not consider this allegation.

worked under a different supervisor; Ms. McChesney was upgraded to Ms. DeJesus's status, and even if the new duties assigned to her had been assigned to Ms. DeJesus instead, they would not have affected Ms. DeJesus's GS level.

The only action that might arguably be considered sufficiently adverse to support a retaliation claim is the AWOL designation that resulted in Ms. DeJesus's having $19 docked, temporarily, from her pay. As previously indicated, however, the Court finds that this was such a minimal adversity that it would not have persuaded a reasonable employee from bringing or supporting a discrimination charge. The Court likewise finds that the action was so trivial that it was not likely to have dissuaded a reasonable employee from making or supporting a discrimination charge. The action at issue is clearly distinguishable from the jury question presented in *White*, where the plaintiff was suspended without pay for thirty-seven days pending the outcome of the investigation into her complaint.

Even considered all together, the events about which Ms. DeJesus complains amount, at most, to a few minor slights and annoyances. Because any harm inflicted was trivial rather than significant, *White*, 548 U.S. at 68, these are simply not the type of actions that might have prevented a reasonable employee from bringing or supporting a discrimination claim. Consequently, they are not sufficiently material to give rise to a retaliation claim, much less to a claim of constructive discharge. *Cf. White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). *See also James v. Metro. Gov't of Nashville*, 243 Fed. Appx. 74, 79 (6th Cir. 2007) (holding that the Government's actions, including denial of the plaintiff's request for a lateral transfer, giving her bad employment evaluations, and imposing cataloguing quotas, were not actionable because "they failed to significantly impact [plaintiff's] professional advancement and would not have dissuaded a reasonable person from filing a Title VII claim").

Even if any of the above actions considered in conjunction with each other were adverse, Ms. DeJesus has failed to meet her burden to introduce a dispute of material fact regarding whether these actions were causally connected in any way to her engaging in protected activity. The only potential evidence of the requisite causal nexus is temporal proximity which, standing alone, is insufficient to create a genuine issue of material fact. *See Deters v. Rock-Tenn. Co.*, 245 Fed. Appx. 516, 529 (6th Cir. 2007);

*Randolph*, 453 F.3d at 737. Defendant is entitled to summary judgment as to this claim as well.

### C. The Hostile Work Environment Claim

Defendant also seeks summary judgment of Ms. DeJesus's Title VII hostile work environment claim. To survive a motion for summary judgment as to this claim, Ms. DeJesus must establish that (1) she is a member of a protected class, (2) she was subjected to harassment, either through words or actions, based on her status as a member of that protected class, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996)). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). The Supreme Court has provided a non-exhaustive list of factors to consider when deciding whether a hostile work environment exists, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

As the plaintiffs argue, the question of whether harassing conduct is sufficiently severe or pervasive enough to establish a hostile work environment is "quintessentially a question of fact." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)). Notwithstanding, summary judgment is appropriate when "the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment." *Id.* (citing *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998). In considering a motion for summary judgment, "[t]he court must consider the totality of the circumstances," and examine all incidents of harassment as a whole to determine whether a hostile work environment existed. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Further, "[b]oth an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual

victim." *Randolph*, 453 F.3d at 733 (citing *Harris*, 510 U.S. at 21–22). "Conduct that is merely offensive, however, is not actionable." *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 459 (6th Cir. 2004).

The Court finds based on Ms. DeJesus's statements during the agency hearing that Ms. DeJesus abandoned any possible claim for hostile work environment based upon *sexual* harassment. The Court therefore presumes that she intended to state a claim in her complaint based upon a *racially* hostile work environment. However, none of the actions of which she complains had an overt, or even covert, racial element to them, nor was the alleged harassment severe or pervasive. Thus, even assuming that Ms. DeJesus's version of events is entirely true, the actions of which she complains do not support a finding of an objectively hostile work environment. *Cf. Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 601 (6th Cir. 2007) (affirming summary judgment for the defendant where the alleged harassment consisted of the imposition of disciplinary action and the plaintiff never experience overt racist remarks or threats); *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000) (in the sexual harassment context, holding that three actions by plaintiff's personnel manager over the course of six months, including placing pack of cigarettes inside the plaintiff's tank top and brassiere strap, telling her "you have lost your cherry," and making vulgar reference to a phrase on employee's sweater, if proven, were not sufficiently severe to comprise hostile work environment).[9] Nor has Ms. DeJesus established that the alleged harassment had the effect of unreasonably interfering with her work performance. *Cf. Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988) (noting that a plaintiff's job performance need not suffer, but she must show that she had difficulty performing her work because of the harassment).

Accordingly, Defendant is entitled to summary judgment as to this claim as well.

## V. NESTOR DeJESUS'S LOSS OF CONSORTIUM CLAIM

An important element of a party's claim for loss of consortium in Tennessee is that the defendant must actually be liable for the injuries to the spouse. *See Swafford v. City of Chattanooga*, 743 S.W.2d 174, 178 (Tenn. Ct. App. 1987) ("[A] husband's or wife's claim for loss of consortium will always be 'derivative' in the sense that the injuries to his or her spouse are an element and must be proved . . . ."). Given that all of Ms. DeJesus's substantive claims are subject to dismissal or summary judgment for the

---

[9] Even if Ms. DeJesus did not intend to abandon her claim of hostile work environment based on sexual harassment, the same analysis would apply and the same result would ensue.

reasons set forth above, her husband's loss of consortium claim is also subject to dismissal. Summary judgment for the Defendants will therefore be granted with respect to Mr. DeJesus's loss of consortium claim as well.

## VI.    CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss will be granted in part and its motion for summary judgment granted in its entirety. An appropriate Order will issue and judgment will enter in favor of the Defendant.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge